2021 IL App (1st) 181635-U
No. 1-18-1635

FIRST DIVISION
November 1, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 97 CR 8785 |
| | ) | |
| DARRIN SMITH, | ) | The Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Presiding Justice Hyman concurred in the judgment.
Justice Coghlan dissented.

**ORDER**

¶ 1    *Held:*  We reverse the denial of defendant's motion for leave to file a successive postconviction petition, where defendant met the Post-Conviction Hearing Act's cause-and-prejudice test for leave to file a successive petition (725 ILCS 5/122-1(f) (West 2018).

¶ 2    Defendant appeals from the trial court's denial of his motion for leave to file a successive postconviction petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), arguing that he alleged the requisite cause and prejudice to file a successive petition asserting his trial counsel's ineffectiveness. For the following reasons, we reverse the trial court's order and remand for further proceedings on the successive petition.

¶ 3                                    BACKGROUND

¶ 4        Defendant was charged with three counts of first degree murder and two counts of home invasion in connection with the shooting death of Anthony Bowden on February 27, 1997.[1] Defendant asserted self-defense as an affirmative defense.

¶ 5        Defendant was tried before a jury in June 1998. Detective William Higgins of the Chicago Police Department testified that, in response to a reported shooting on the evening of February 27, 1997, he and Detective Edward O'Boyle went to a second-floor apartment in the 2800 block of East 79th Street, where Higgins saw Bowden's body at the rear door to the apartment. Following conversations with Bowden's father and others, the detectives went to defendant's mother's home at approximately 2:30 a.m. Defendant's mother led them to a bedroom where defendant was sleeping. Higgins observed a .22 caliber semi-automatic pistol on a table next to the defendant's bed, along with several rounds of ammunition. Higgins recovered the pistol, and defendant was taken into custody.

¶ 6        Thomas Reynolds, a forensic investigator for the Chicago Police Department, testified that he arrived at the scene at approximately 9:35 p.m. on February 27, 1997. He saw Bowden's body on the kitchen floor, just inside the rear door to the apartment. He observed gunshot wounds to Bowden's head and two .22-caliber cartridge casings near Bowden's feet.

¶ 7        Former Assistant State's Attorney Linda Jakubs testified that she interviewed defendant on February 28, 1997. A court reporter transcribed Jakubs' questions and defendant's responses into

---

[1] With respect to the first degree murder counts, count I alleged that defendant intentionally or knowingly shot and killed Bowden (720 ILCS 5/9-1(a)(1) (West 1996), count II alleged that he knew that shooting Bowden created a strong probability of death or great bodily harm  (720 ILCS 5/9-1(a)(2) (West 1996), and count III alleged that he shot and killed Bowden while committing the forcible felony of home invasion. 720 ILCS 5/9-1(a)(3) (West 1996).

a typewritten statement. Jakubs reviewed the statement with defendant, who had an opportunity to make corrections. The statement was admitted into evidence and published to the jury.

¶ 8    In the statement, defendant indicated he had known Bowden for over twenty years. Defendant stated that, about three weeks before the shooting, he arranged to purchase $12,000 worth of cocaine for someone named Paul Wilson. Defendant used Wilson's money to purchase "half a kilo" of cocaine. He was supposed to deliver the cocaine to Wilson at a certain time and place, but Wilson did not show up. Defendant subsequently went to Bowden's house, where defendant showed the cocaine to Bowden. After they left Bowden's house, defendant went into a liquor store, while Bowden "stood on the corner talking with some guys." As defendant and Bowden were walking back to Bowden's house, two men put a gun to defendant's head and robbed him of the cocaine. Bowden "walked away" during the robbery, and defendant believed that Bowden "had me set up to be robbed." Defendant later called Wilson and told him that he was robbed of the cocaine. Wilson told defendant "that if I didn't have his stuff he was going to kill me." Defendant stayed at his mother's house for the next week because he was afraid of Wilson.

¶ 9    Defendant's statement further related that, on the afternoon of February 27, a friend of his named Jason called and asked him for help buying marijuana. Defendant met with Jason, carrying a .22 caliber gun for "protection." Defendant and Jason sought out Bowden because Bowden would know where to purchase marijuana. They spoke to Bowden's father and then went to an apartment at 79th Street and Escanaba Avenue. Defendant knocked on the back door of the apartment, a female voice answered, and defendant asked for "Tony." Bowden came and opened the door, and defendant and Jason entered the kitchen. Defendant asked Bowden why he had him "set up to be robbed," and Bowden responded by saying "f*** you." Defendant felt "angry," pulled out his gun, and shot Bowden twice in the head. Defendant recalled that the "gun got jammed"

after the second shot. Defendant worked to unjam the gun by "sliding it back and forth." The gun "went off again" and fired a third shot while still pointed at Bowden. Defendant stated that Bowden was not holding a gun when defendant shot him.

¶ 10     After the shooting, defendant went to a liquor store and then to his mother's residence. He put the gun on a table by his bed and fell asleep, until he was awakened by police. The typewritten statement was signed by defendant, Jakubs, Detective O'Boyle, and another Assistant State's Attorney.

¶ 11     Donna Knox testified that she resided at the apartment when the shooting occurred. She described the apartment as a "drug house" where people went to get high. She recalled that on the date of the shooting, several people were in the apartment, including Bowden. Knox acknowledged she was addicted to heroin and cocaine, and that she used drugs on the afternoon of February 27, 1997. However, she stated that she was not high when the shooting took place that evening.

¶ 12     Knox recalled answering a knock at the back door, which adjoined the kitchen. Through the door, someone who identified himself as "D" said that he wanted to see "Tony." Knox called out to Bowden, who "looked through the peep hole and started smiling, saying ooh, that's my boy." Bowden opened the door, and two men stepped into the kitchen. One of the men asked Bowden "where's my sh**?"  In response, Bowden "started denying it like he didn't know what he was talking about." The man who was speaking to Bowden raised his arm, holding a gun. Knox "heard two shots go off and it jammed on the third one." Knox saw Bowden on the floor, ran out of the kitchen, and then heard two more shots. Knox did not see Bowden with a gun at any point during the incident.

¶ 13     On cross-examination, Knox testified that "normally" the people who came to the apartment "didn't have pistols." However, she acknowledged that she did not search the people who entered

the apartment. She was not specifically asked whether she had ever seen Bowden with a gun. She acknowledged that she could not see where Bowden's hands were after she saw the gun. She stated that she ran into a bedroom after she heard shots, and that Robert Bradford was also in the bedroom.

¶ 14　　Keith Ternoir testified that he was in the apartment at the time of the shooting. At approximately 8:00 p.m., he was in a bedroom with Bowden and "two females." Ternoir recalled that Knox was in another room. Ternoir heard a knock at the back door. Knox answered the door, then came to the bedroom and told Bowden that someone wanted to see him. About five minutes after Bowden left the bedroom, Ternoir heard "approximately 3 or 4" gunshots. After the gunshots, Ternoir stayed in the bedroom for about 45 seconds, until he heard Knox say that Bowden was shot. He went to the kitchen and saw Bowden on the floor, who was still breathing. Ternoir "propped Bowden up and tried to see if he was okay" and told someone to call the police. Ternoir did not see any gun on or near Bowden.

¶ 15　　On cross-examination, Ternoir stated that he and Bowden arrived at the building at the same time and that they entered together. In addition to the people with him in the bedroom and Knox, Ternoir testified that he heard the voices of approximately three to five other people in the apartment. Ternoir answered negatively when defense counsel asked him if he had patted down Bowden or went "through his pockets" before the shooting. Defense counsel did not ask Ternoir if he ever saw Bowden carry a gun or if he knew whether Bowden had a gun.

¶ 16　　The State introduced a stipulation that the medical examiner who performed Bowden's autopsy would testify that Bowden sustained three gunshot wounds. There was one entry wound near the right eye, and two entry wounds on the right side of the head above the ear.

¶ 17　　Beth Patty, a forensic scientist with the Illinois State Police, testified as an expert in firearms identification. She had examined the gun and unfired bullets recovered from defendant, as well as

two cartridge casings from the scene of the shooting. She testified that the bullets and the fired cartridges were both .22 caliber. Patty test fired the gun and compared the test-fired cartridge casings with the casings found at the scene. She could not determine whether the cartridge casings recovered at the scene came from the gun recovered from defendant, although she opined that it was possible that they did. Patty stated that when she test fired the gun, the cartridge case did not completely exit the firearm, so she had to manually clear the gun after each shot. Defense counsel did not ask Patty whether the casings found at the scene could have come from a different type of gun than that recovered from defendant.

¶ 18    Defendant elected to testify at trial. He stated that he had known Bowden for many years and they were good friends. He testified that in February 1997, he purchased cocaine for Wilson, and that he was robbed of the cocaine approximately ten days before his arrest. On February 27, defendant and his friend Jason were looking for Bowden in order to purchase marijuana. Defendant carried a .22 caliber gun with him, for protection from Wilson. Defendant learned that Bowden was at the apartment. Defendant knocked on the door, and a female answered. He told her his name was Darrin and that he was looking for Bowden. Bowden came to the door and said "That's my boy. I'm going to let him in." The door opened, and defendant and Jason entered the kitchen. Defendant asked Bowden if he could take him to get some marijuana, and Bowden said that he could. Defendant recalled that Bowden had an "antenna" in his hand, which was "something [Bowden] was smoking crack out of." Bowden set the antenna down and asked defendant "what had happened to [defendant] the other night." Defendant believed that Bowden was referring to the robbery, and defendant asked Bowden if he had set defendant up to get robbed. Bowden responded "f*** you" and they began to argue for two or three minutes.

¶ 19 Defendant testified that Bowden pulled a gun from his jacket pocket, and then defendant pulled out his gun to "protect myself." Defendant stated that he fired first but Bowden "fired off a shot too," and then defendant fired a second shot. Defendant recalled that after he fired his second shot, he was "trying to unjam the gun" when it fired a third bullet that struck Bowden. Defendant saw Bowden's gun on the floor as he left the apartment. Defendant went to his mother's house, where he slept until he was awakened by Detective O'Boyle. Defendant acknowledged that his gun was on his nightstand when police found him.

¶ 20 Defendant proceeded to testify that, at different points while in custody, Detective O'Boyle choked, slapped, and threatened him. Defendant acknowledged that he spoke to a State's Attorney in the presence of a court reporter, but he claimed that the transcribed statement was not accurate because he "wasn't allowed to tell the truth" by Detective O'Boyle.

¶ 21 On cross-examination, defendant stated that Bowden "c[a]me out with the gun and I came out with mine, and I shot before he shot." Defendant agreed that after Bowden fired, defendant fired a second shot that struck Bowden in the head. Defendant agreed that his gun jammed after the second shot. Defendant testified that he was moving toward the door to leave as he was unjamming the gun. However, he admitted that the gun was still pointed at Bowden when it fired the third shot. Defendant stated that Bowden's gun was next to his body when defendant left the apartment.

¶ 22 On redirect examination, defendant testified that when Bowden pulled out a gun, he believed Bowden was going to shoot him. Defendant again stated that he fired first, and that Bowden's gun went off shortly after defendant's first shot. Defendant denied that he intended to shoot Bowden again when he was unjamming his gun.

¶ 23 The defense did not present any other witnesses. In rebuttal, the State called Detective O'Boyle, who denied ever choking, slapping, or threatening defendant.

¶ 24    In conjunction with the instructions on first degree murder, the jury was instructed that it could find defendant guilty of the lesser offense of second degree murder if it found, as a mitigating factor, that defendant believed that the circumstances justified deadly force, but that his belief was unreasonable.

¶ 25    The jury found defendant guilty of first degree murder and home invasion. The trial court sentenced him to consecutive terms of 60 years' imprisonment for first degree murder and 10 years' imprisonment for home invasion.[2]

¶ 26    On direct appeal, defendant did not challenge the murder conviction, but challenged the home invasion conviction on the grounds that (1) the evidence of that offense was insufficient and (2) that his trial counsel was ineffective in failing to request a jury instruction on the limited authority doctrine. This court reversed the home invasion conviction and remanded for a new trial on that offense, while affirming the judgment on the murder conviction. *People v. Smith*, no. 1-98-3959 (1999) (unpublished order under Illinois Supreme Court Rule 23). On remand, the State nol-prossed the home invasion charges, and defendant's mittimus was corrected to reflect only the 60-year sentence for first degree murder.

¶ 27    On June 18, 2001, defendant filed a petition pursuant to the Act in which he contended that his 60-year sentence was improper pursuant to *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The trial court summarily denied the petition on July 13, 2001. In May 2002, this court denied defendant's motion for leave to file a late notice of appeal from that order.

¶ 28    In October 2006, defendant filed a petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2006)), in which he contended that his

---

[2] With respect to the three counts of first degree murder, the trial court merged the findings of guilt on counts II and III into count I and sentenced defendant to 60 years on count I.

indictment, conviction, and sentence were void. The trial court dismissed the section 2-1401 petition and denied defendant's motion to reconsider. Defendant appealed, and his appointed appellate counsel moved to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). In September 2009, this court granted counsel's motion to withdraw and affirmed the dismissal of the section 2-1401 petition. *People v. Smith*, No. 1-08-0321 (2009) (unpublished summary order).

¶ 29 On March 17, 2015, defendant filed a motion for leave to file a successive postconviction petition under the Act. In that motion, defendant averred that in December 2014, he was discussing his case with another inmate when a third inmate, Oscar Turner, overheard their conversation. Turner then told defendant that he had also been in the apartment on February 27, 1997, and that Bowden had shown Turner a .38 revolver before the shooting. Defendant asserted that his trial counsel was ineffective in failing to investigate or interview all persons at the apartment on the date of the shooting, and that he was prejudiced because Turner was not called as a trial witness to corroborate his affirmative defense of self-defense. In conjunction with the motion, defendant filed a proposed successive postconviction petition alleging trial counsel's ineffectiveness in failing to investigate, interview, or call Turner as a witness. The proposed petition attached a notarized affidavit from Turner.

¶ 30 In his affidavit, Turner stated that he was 15 years old as of February 27, 1997 and that he "often sold drugs" in Donna Knox's apartment. At the time of the shooting, the apartment was filled with customers, including Bowden. Turner recalled that, as he was selling bags of crack cocaine, Bowden asked whether Turner wanted to buy a .38 revolver. When Turner asked to see the gun, Bowden removed the bullets and handed it to him, before Bowden took the gun back and reloaded it. Bowden offered to sell the gun to Turner "for $100 plus 7 bags of crack." Turner responded that he would buy it once he made enough money from selling crack. Approximately

20 to 30 minutes after he spoke to Bowden, Turner was in the front of the apartment when he heard a knock on the back door. Turner initially "thought it was a customer" but after a few minutes he realized that Knox "hadn't come telling me how many bags of crack the customer(s) wanted, as she would usually do." He then heard Bowden "as he argued in the back with a man who I never got the chance to see." Turner then heard four gunshots: "The first gunshot was the loudest; it sounded like an M-80 (boom sound); and the other shots that followed sounded like little fire crackers." Turner was so startled that he "dropped some of the bags of drugs on the floor." Everyone in the apartment was "moving around as [he] was busy trying to pick up my bags of crack." Turner heard screaming and went to the kitchen, where he saw Bowden on the floor. Turner stood there "frozen" until Knox's daughter shook his arm.[3] Turner saw that she was "holding the same .38 [Bowden] was going to sell me" and asked Turner if the gun was his. Turner shook his head no, ran home, and never returned to the apartment. Turner averred that he was never interviewed by "any attorney or other person or official" regarding the shooting.

¶ 31     In the proposed successive petition, defendant alleged that his trial counsel was ineffective in failing to "investigate and/or interview" Turner or call him as a trial witness to corroborate the affirmative defense of self-defense. Defendant claimed that "[h]ad the jury heard Turner's credible testimony, there is [a] strong probability that Defendant would have been found not guilty of intentionally murdering" Bowden. He additionally claimed that the failure to call Turner "impeded counsel's ability to competently raise a supported affirmative defense of compulsion, pursuant to 720 ILCS 5/7-11, which would have justified Defendant's action in shooting Mr. Bowden and almost certainly resulted in Defendant being acquitted of murder in this case."

---

[3] Turner's affidavit does not include the name of Knox's daughter.

¶ 32    On June 24, 2015, the trial court (Hon. Nicholas R. Ford) entered an order denying the motion for leave to file a successive postconviction petition. Defendant appealed (no. 1-15-2318), contending that the order should be vacated and the matter remanded for a hearing before a different judge because Judge Ford had served as a prosecutor during pretrial stages of defendant's case. In December 2017, this court reversed the denial of defendant's motion and remanded for Judge Ford to determine if he had represented the State during defendant's pretrial proceedings. *People v. Smith*, 2017 IL App (1st) 152318-U. On remand, Judge Ford verified that, although he had no specific recollection of the matter, he was the prosecutor assigned to defendant's case during pretrial proceedings. Accordingly, Judge Ford recused himself and the matter was reassigned to the Honorable James B. Linn.

¶ 33    On May 18, 2018, Judge Linn denied defendant's motion for leave to file a successive postconviction petition. The court explained its conclusion that defendant did not meet the "cause and prejudice" test for leave to file a successive petition:

> "The affidavit from Mr. Turner, assuming it's accurate and true, said that he saw the victim earlier in the day with a gun but he is not an eyewitness to the event, didn't see who did any shooting or what happened during the event. Only that earlier in the day [he] saw the victim with a gun. That he was negotiating with the victim to buy a gun in return for cocaine.
>
> I find * * * even if Oscar Turner were available to testify and his lawyer knew about it and made the decision in trial strategy to call him, his testimony would be so limited as not to effect the outcome of the case.

I find the *pro se* petition certainly does not fit the cause and

prejudice test. There is no prejudice to him not being called. Pro se

successive post conviction is denied without merit. No prejudice

from limited affidavit of Oscar Turner."

¶ 34     Defendant filed a notice of appeal on June 28, 2018. On January 3, 2020, our supreme court

entered a supervisory order directing this court to treat defendant's notice of appeal as a properly

perfected appeal from the May 18, 2018 denial of defendant's motion for leave to file a successive

postconviction petition.

¶ 35                                               ANALYSIS

¶ 36     On appeal, defendant asserts that the trial court erred in denying his motion for leave to file a

successive postconviction petition. He argues that he showed the requisite "cause" and "prejudice"

under the Act by alleging trial counsel's ineffectiveness in failing to identify Turner as a witness

whose trial testimony would have corroborated his affirmative defense of self-defense.[4] He asks

that we reverse the trial court's order and remand for further postconviction proceedings on the

successive petition.

¶ 37     "The Post-Conviction Hearing Act provides a procedural mechanism through which a criminal

defendant can assert that his federal or state constitutional rights were substantially violated in his

original trial or sentencing hearing. [Citations.]" *People v. Davis*, 2014 IL 115595, ¶ 13. As the

Act "contemplates the filing of only one postconviction petition," a defendant "faces immense

procedural default hurdles when bringing a successive postconviction petition" which are "lowered

only in very limited circumstances." *Id.* ¶ 14. "One such basis for relaxing the bar against

_____

[4] Defendant's appellate briefing makes no mention of the claim in the successive petition that trial counsel's failure to call Turner impeded an "affirmative defense of compulsion."

successive postconviction petitions is where a petitioner can establish 'cause and prejudice' for the failure to raise the claim earlier." *Id.*

¶ 38    The cause and prejudice test is codified in section 122-1(f) of the Act, which provides that leave of court to file a successive petition may be granted "only if a petitioner demonstrates cause for his or her failure to bring the claim in his or her initial post-conviction proceedings and prejudice results from that failure." 725 ILCS 5/122-1(f) (West 2018). The Act instructs that a defendant "shows cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings." *Id.* A defendant "shows prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*

¶ 39    When a defendant moves for leave to file a successive petition, the circuit court "must decide the legal question of whether a defendant has satisfied the section 122-1(f) requirement of showing cause and prejudice" which is "a preliminary screening to determine whether defendant's *pro se* motion * * * adequately alleges facts demonstrating cause and prejudice. [Citation.]" *People v. Bailey*, 2017 IL 121450, ¶ 24. If a defendant has "made a *prima facie* showing of cause and prejudice," leave to file the petition should be granted. *Id.* We are mindful that, at the pleading stage of postconviction proceedings, "all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. [Citations.] In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations. [Citations.]" *People v. Robinson*, 2020 IL 123849, ¶ 49. "[T]he denial of a motion for leave to file a successive petition alleging cause and prejudice is reviewed *de novo*." *Id.*, ¶ 39 (citing *People v. Wrice*, 2012 IL 111860, ¶¶ 49-50).

¶ 40　　　　On appeal, defendant argues his motion for leave to file the successive petition and supporting documents demonstrate cause and prejudice regarding his claim of ineffective assistance. With respect to cause, he asserts that the "objective factor" preventing him from bringing this claim in his prior postconviction petition is apparent—namely, that he did not know Turner had relevant information until he encountered him in 2014. With respect to prejudice, defendant asserts that the proposed petition and Turner's supporting affidavit adequately allege that trial counsel was ineffective in failing to investigate and identify Turner as a witness, because Turner's testimony would have corroborated his trial testimony and supported his claim of self-defense.

¶ 41　　　　Regarding the first part of the cause and prejudice test, the State does not dispute that defendant sufficiently alleges "cause" for failing to bring this claim earlier. We agree that defendant adequately alleges cause. His motion alleges that he did not learn until December 2014 that Turner had knowledge of the shooting, and Turner's affidavit states that he had never been interviewed about the incident by any attorney. Under similar circumstances, we have found cause established where a potential witness was not known to defendant until after the initial postconviction petition. *People v. Johnson*, 2019 IL App (1st) 153204, ¶¶ 38-39 (defendant established cause to support claim that counsel was ineffective for failing to investigate or present exculpatory eyewitness at trial, where witness's affidavit stated that he did not come forward until after defendant's direct appeal and initial postconviction petition). In this case, defendant's failure to learn of Turner until 2014 was an "objective factor" that impeded his ability to raise the instant claim in his initial postconviction proceeding. 725 ILCS 5/122-1(f) (West 2018).

¶ 42　　　　We turn to the question of whether defendant adequately alleged "prejudice" under section 122-1(f) of the Act, *i.e.*, whether trial counsel's alleged ineffectiveness in failing to identify Turner as a defense witness "so infected the trial that the resulting conviction or sentence violated due

process." Defendant argues that he met this standard, because the proposed successive petition and Turner's affidavit show that trial counsel was deficient in failing to investigate witnesses that could support a theory of self-defense and, had the jury heard Turner's testimony, there is a reasonable probability that there would have been a different result at trial.

¶ 43    The State responds that defendant does not satisfy the "prejudice" part of the cause and prejudice test, because the successive petition's underlying claim of ineffective assistance of trial counsel fails the governing two-prong standard for such claims under *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Cherry*, 2016 IL 118728, ¶ 24  ("Ordinarily, in determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test established in" *Strickland*). The State primarily contends that defendant cannot satisfy the prejudice prong of the *Strickland* standard because, even with Turner's proposed testimony, "there is no reasonable probability the fact finder would have had a reasonable doubt" of defendant's guilt. The State otherwise contends that defendant cannot satisfy the performance prong of *Strickland* because trial counsel's failure to identify Turner as a potential witness was not objectively unreasonable.

¶ 44    Thus, to determine whether defendant alleges the requisite prejudice under the Act's cause and prejudice test, we review the requirements for claims of ineffective assistance of counsel. "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. [Citation.]" *Cherry*, 2016 IL 118728, ¶ 24. Specifically, "the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

¶ 45    Regarding the prejudice requirement, a "reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair. [Citation.]" *People v. Evans*, 209 Ill. 2d 194, 220 (2004). "Because a defendant must satisfy both prongs of the *Strickland* test to prevail, the failure to establish either precludes a finding of ineffective assistance of counsel. [Citation.]" *Cherry*, 2016 IL 118728, ¶ 24.

¶ 46    For the following reasons, we find that the proposed successive petition and Turner's supporting affidavit adequately allege both prongs of the *Strickland* standard and set forth a viable claim of ineffective assistance of trial counsel. First, we determine that defendant adequately alleged that counsel's investigation was unreasonable, insofar as counsel failed to investigate and identify Turner as a witness.

¶ 47    "Trial counsel has a duty to conduct both factual and legal investigation on behalf of the client." *People v. Montgomery*, 327 Ill. App. 3d 180, 185 (2001). " 'Attorneys have an obligation to explore all readily available sources of evidence that might benefit their clients.' " *People v. Cooper*, 2013 IL App (1st) 113030, ¶ 57 (quoting *People v. Makiel*, 358 Ill. App. 3d 102, 107 (2005)). "An attorney who fails to conduct a reasonable investigation and interview witnesses cannot be found to have made decisions based on valid trial strategy. [Citation.]" *Id.* " 'Whether defense counsel was ineffective for failure to investigate is determined by the value of the evidence that was not presented at trial and the closeness of the evidence that was presented.' " *Id.* (quoting *Makiel*, 358 Ill. App. 3d at 107).

¶ 48    The State suggests that defendant cannot meet the *Strickland* deficiency prong based on trial counsel's failure to identify Turner, as Turner was an "unnamed and unknown witness." The State suggests that defense counsel was under no obligation to attempt to identify other persons in the

"crack house" where the shooting occurred. The State avers that Turner was not a "readily available source of evidence," as no trial witness mentioned him and that defendant "does not claim that Turner was listed in any police report or other discovery." The State further argues that there was "little value" to Turner's proposed testimony, as he "would not have corroborated [defendant's] claim of self-defense."

¶ 49     We disagree. Keeping in mind that we are assessing the sufficiency of the allegations rather than making credibility determinations, we believe the successive petition and Turner's affidavit make a *prima facie* allegation that Turner could have been located by counsel with reasonable investigation. We acknowledge that Turner's affidavit stated that he never returned to the apartment after the shooting. Nevertheless, his affidavit and the record suggest that he could have been found with reasonable diligence, through other known witnesses. Significantly, Turner's affidavit indicated that he knew Knox, that he "often" sold drugs in her apartment, and that Knox "usually" told him when customers arrived and how much crack they wished to purchase. Taking Turner's statements as true, they indicate that Knox personally knew him and could have identified him as someone who was in the apartment on the date of the shooting. Since Knox testified as a State's witness at trial, defense counsel presumably could have interviewed her and sought information from her about others who may have been in the apartment. Further, both Knox and Ternoir testified that there were several people in the apartment at the time of the shooting. Although neither of them explicitly named Turner, the trial record suggests there were multiple witnesses that counsel could have interviewed that could potentially have led to Turner.[5]

---

[5] We also note that, although defendant's custodial statement and his trial testimony indicated that he was with "Jason" when he arrived at the apartment (and Knox testified that two men came to the door and entered the kitchen), it is not apparent whether defense counsel attempted to investigate or interview "Jason" to determine if he could corroborate defendant's self-defense testimony.

¶ 50    We are also not persuaded by the State's argument that trial counsel's failure to investigate Turner could not be construed as deficient performance, for purposes of the first *Strickland* prong, because Turner's testimony would have been of "little value" to defendant's claim of self-defense. As we will more thoroughly discuss with respect to the prejudice prong of the *Strickland* standard, Turner's proposed testimony would corroborate defendant's claim of self-defense, insofar as Turner would state (1) he saw Bowden with a .38 revolver a short time before the shooting; (2) Turner recalled that one shot was louder than the others, suggesting that both men fired shots, and (3) Turner saw Knox's daughter holding the same .38 revolver moments after the shooting.

¶ 51    Having concluded that defendant adequately alleged trial counsel's deficient performance under the first *Strickland* prong, we additionally find that defendant adequately alleges that counsel's performance resulted in prejudice, *i.e.*, "a reasonable probability that, but for counsel's deficient performance, the result of the proceedings would have been different. [Citation.]" *Cooper*, 2013 IL App (1st) 113030, ¶ 53. That is, we believe that Turner's trial testimony would raise a reasonable probability of a different outcome at trial.

¶ 52    In reaching this conclusion, we keep in mind that defendant was convicted of first degree murder, despite his assertion of the affirmative defense of self-defense. Thus, "the State ha[d] the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense. [Citation.]" *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004). The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs

of the person threatened were objectively reasonable. *Id.* If the State negates any of these elements, the claim of self-defense fails. *Id.*

¶ 53        We also note that the jury's options were not limited to finding defendant guilty or not guilty of first-degree murder. The jury also had the option of finding him guilty of second-degree murder, if it found as a mitigating factor that he actually but unreasonably believed that his use of force was justified. 720 ILCS 5/9-2(a) (West 1996); *People v. Jeffries*, 164 Ill. 2d 104, 128-29 (1995) ("when a defendant is found guilty of second degree murder, the trier of fact has, in essence, concluded that the evidence that the defendant has offered was not sufficient to support his claim of self-defense. The defendant, however, has proven by a preponderance of the evidence the existence of a mitigating factor sufficient to reduce the offense of murder to second degree murder.").

¶ 54        In finding defendant guilty of first degree murder, the jury found beyond a reasonable doubt that defendant intended to kill or do great bodily harm to Bowden or knew that his acts would cause Bowden's death (720 ILCS 5/9-1(a)(1) (West 1996)), and that the State had negated at least one element of his claim of self-defense. Further, in declining to find him guilty of second-degree murder, the jury apparently did not find that defendant had an actual but unreasonable belief that his use of force was justified.

¶ 55        After carefully reviewing the trial evidence and the contents of Turner's affidavit, we believe that it raises at least a reasonable probability that a jury could reach a different verdict, had it heard Turner's testimony. While we do not purport to make credibility determinations, a jury could find that Turner's affidavit provides some corroboration of defendant's trial testimony that Bowden was armed at the time of the shooting. Since there was no independent corroboration of defendant's self-defense testimony at his 1998 trial, Turner's corroborative testimony could very well have

changed the jury's assessment of defendant's self-defense claim, potentially leading to a different result.

¶ 56    We acknowledge that Turner does not claim to have been an eyewitness to the actual shooting, but states that he was elsewhere in the apartment. Thus, the State correctly notes that Turner would not be able to say whether defendant or Bowden was the first to draw a gun. Nevertheless, Turner's testimony, if accepted by a jury, could still be viewed as corroboration of defendant's self-defense claim. Turner's affidavit recounts that Bowden showed him a .38 caliber revolver approximately 20 to 30 minutes before the shooting. From this testimony, a jury would be entitled to infer that Bowden still had the gun at the time of the shooting.

¶ 57    Furthermore, Turner recalls in his affidavit that he heard four shots, with one shot (presumably from Bowden's .38 caliber gun) that was louder than the others.  A jury could thus find that Turner corroborated defendant's testimony that he fired three shots (with a .22 caliber gun) and that Bowden fired one shot. We acknowledge, as the State points out, that Turner's affidavit differs from defendant's trial testimony regarding the specific order of gunshots. Turner states that the first shot was the loudest shot, whereas defendant repeatedly testified that he fired one shot before Bowden fired. However, it would be for the jury to determine what weight, if any, to give this discrepancy in evaluating the extent to which Turner corroborated defendant's claim of self-defense. See *People v. Jackson,* 2020 IL 124112, ¶ 66 ("It is the function of the jury as the trier of fact to assess the credibility of the witnesses and to resolve discrepancies and inconsistencies in the evidence. [Citations.]"). We will not presume that the jury would rely on one particular discrepancy to discredit the remainder of Turner's or defendant's account.

¶ 58    Turner's affidavit additionally recounts that shortly after the shooting, he saw Knox's daughter "holding the same .38" that Bowden offered to sell to him. A jury could find that this testimony

further corroborated defendant's claim that Bowden pulled out a gun during the argument. Moreover, if the jury credited Turner's recollection that Knox's daughter picked up the gun just after the shooting, it reasonably could find that this explained why police did not find a gun on or near Bowden's body.

¶ 59    For these reasons, we reject the State's argument that Turner's proposed testimony could not affect the trial outcome because the evidence of defendant's guilt was "overwhelming." Again, the State emphasizes that since Turner "did not see Bowden with a gun at the time of the shooting" he could not say that Bowden "raised the gun first." As discussed, although Turner did not see the actual shooting, his proposed testimony would corroborate key aspects of defendant's self-defense testimony—namely, that Bowden was armed and fired a shot—and arguably could explain why Bowden's gun was not recovered from the scene. Turner's testimony would put defendant's otherwise uncorroborated claim of self-defense in a different light. In other words, if Turner testified consistent with his affidavit, a jury could find that the evidence of guilt was *not* overwhelming, and that the evidence of self-defense was much closer than at defendant's 1998 trial (where defendant's self-defense testimony was not corroborated by any other witness).

¶ 60    While we do not presume to know how a jury would assess Turner's credibility if he were to testify, we do find that Turner's affidavit raises a "reasonable probability that the result would have been different," that is, a probability "sufficient to undermine confidence in the outcome." *Evans*, 209 Ill. 2d at 220. We again note that, in this case, a different outcome would *not* require the jury to acquit defendant after finding that he was justified in shooting Bowden. A different result also includes the possibility that a jury would find him guilty of second-degree murder upon finding that he held an unreasonable belief that the shooting was justified.

¶ 61    We respectfully disagree with the dissent, whose primary contention is that defendant's motion for leave to file a successive petition and Turner's affidavit do not make a "substantial showing" of ineffective assistance of trial counsel, such that defendant cannot meet the prejudice portion of the Act's cause-and-prejudice test. However, our precedent simply does not require a defendant to make a "substantial showing" of a constitutional violation to satisfy the cause-and-prejudice test. Rather, our supreme court instructs that the cause-and-prejudice inquiry is a "preliminary screening" to determine whether defendant "adequately alleges facts demonstrating cause and prejudice"; that is, the question is "whether defendant has made a *prima facie* showing of cause and prejudice." *Bailey*, 2017 IL 121450, ¶ 24.

¶ 62    In suggesting that defendant is required to make a "substantial showing" of counsel's ineffectiveness to meet the cause-and-prejudice standard for leave to file his petition, the dissent cites *People v. Johnson*, 2019 IL App (1st) 153204. However, *Johnson* is procedurally distinct from the instant case. *Johnson* was an appeal from the second-stage dismissal of an amended successive postconviction petition, after the trial court had granted leave to file a successive postconviction petition. See *id.* ¶ 32 ("When, as here, the trial court grants a defendant leave to file a successive postconviction petition, the petition is effectively advanced to the second stage of postconviction proceedings. [Citation.]"). The portion of the *Johnson* opinion discussing whether there was a "substantial showing" of ineffective assistance of counsel arose in its discussion of defendant's argument that he was entitled to a third-stage evidentiary hearing regarding his claim that counsel was ineffective in failing to investigate or present an exculpatory witness. *Id.* ¶¶ 42-53 (concluding defendant made a substantial showing of counsel's deficient performance and prejudice, warranting third-stage proceedings). Significantly, *Johnson*'s "substantial showing" discussion came only *after* the court explained that defendant had satisfied the cause-and-prejudice

test. See *id.* ¶¶ 35-41. Thus, *Johnson* does not suggest that a "substantial showing" standard applies in reviewing whether the trial court properly denied leave to file a successive petition under the cause-and-prejudice test.

¶ 63    The dissent cites other decisions to argue that Turner's affidavit was insufficient to meet the cause-and-prejudice standard, but those cases are distinguishable from the instant appeal. First, *People v. Horton*, 2021 IL App (1st) 180551, affirmed the denial of a motion for leave to file a successive postconviction petition asserting an actual innocence claim, premised on an affidavit from a witness (Hyde) who related that he provided a gun to the person who was shot and killed by defendant. However, our analysis in *Horton* discussed whether defendant set forth a colorable claim of actual innocence, not whether he met the cause-and-prejudice test. Although the dissent correctly notes that a defendant seeking to file a successive petition based on either actual innocence or cause-and-prejudice must "submit enough in the way of documentation to allow a circuit court to make that determination," (*People v. Bailey*, 2017 IL 121450 ¶ 21 (internal quotation marks omitted)), a petition premised on a claim of actual innocence involves distinct requirements. See *People v. Robinson*, 2020 IL 123849, ¶ 47 ("To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial [Citations.]").

¶ 64    Moreover, as a factual matter, Turner's affidavit was much more detailed and corroborative of the defendant's claim of self-defense, compared to Hyde's affidavit in *Horton*. Hyde's affidavit related that he gave the victim a gun "on the night of the shooting" and then "left town for two days" before he learned from someone else that the victim had been killed. *Id.* ¶¶ 32-33. By contrast, in this case, Turner related that Bowden showed him a .38 caliber gun approximately 30

minutes before the shooting, Turner was still in the apartment when he heard shots (including one that was louder than the others), and he then saw Knox's daughter holding the same .38 caliber gun near Bowden's body.

¶ 65    The dissent also cites *People v. Jackson*, 2021 IL App (1st) 190406-U, which affirmed the summary dismissal of a postconviction petition asserting a claim of actual innocence, premised on an affidavit in which a witness "merely alleged that [the deceased victim] 'had a gun' when the shooting occurred." *Id.* ¶ 46. *Jackson* is procedurally inapplicable, as it contains no discussion of the cause-and-prejudice test. Moreover, Turner's affidavit contained far more factual detail than the "conclusory, fanciful allegations" of the affidavit discussed in *Jackson.* See *id.* ¶ 50.

¶ 66    The dissent's reliance on *People v. Smith*, 181178-U, which affirmed a first-stage summary dismissal of a postconviction petition, is similarly unpersuasive. *Smith* did not involve the cause-and-prejudice standard for filing a successive petition, and is also factually distinguishable. The *Smith* defendant testified at trial that he was afraid of the decedent (Jackson) because Jackson had shot defendant 13 days earlier. *Id.* ¶¶ 15-16. When defendant saw Jackson rounding a corner with "something in his hands" he "started shooting at [Jackson] without thinking about what was in Jackson's hands." *Id.* ¶ 16. Defendant's postconviction petition asserted that his trial counsel was ineffective in failing to call a witness (Dockery), whose affidavit stated that she heard gunshots and saw Jackson on the ground with a gun in his hand. *Id.* ¶ 21. This court concluded that defendant could not have been prejudiced by his counsel's failure to call Dockery, as "Dockery's testimony would not change defendant's admissions that he did not know what was in Jackson's hands, that Jackson did not threaten force against him and that he began firing at Jackson as soon as he saw Jackson  round the corner." *Id.* ¶ 33. Further, insofar as "defendant's theory of self-defense was not based on a claim Jackson threatened him with a gun," Dockery's affidavit suggested "a

different theory of self-defense" than that presented at trial and "d[id] not necessarily corroborate defendant's claim of self-defense." *Id.* ¶ 34. In contrast to the situation in *Smith*, defendant in the instant case testified that he saw Bowden pull out a gun before he shot Bowden in self-defense. Turner's affidavit corroborates defendant's self-defense theory at trial, at least insofar as Turner saw Bowden with a gun shortly before the shooting and saw the same gun near Bowden moments after the shooting. Keeping in mind that the applicable inquiry is whether defendant adequately alleges facts demonstrating cause and prejudice, (*Bailey*, 2017 IL 121450, ¶ 24), we respectfully disagree with the dissent.

¶ 67 For the above reasons, we conclude that the proposed successive petition and Turner's supporting affidavit adequately alleged both the deficient performance and prejudice prongs of the *Strickland* standard, premised on trial counsel's the failure to call Turner as a witness. As defendant alleged a viable claim of ineffective assistance of trial counsel, defendant's motion for leave to file the successive petition met the prejudice portion of the Act's cause-and-prejudice test. That is, defendant adequately alleged that counsel's ineffective assistance "so infected the trial as to deny him due process." 725 ILCS 5/122-1(f) (West 2018). We thus conclude that defendant "adequately alleges facts demonstrating cause and prejudice" under section 122-1(f). *Smith*, 2014 IL 115946, ¶ 34. Thus, his motion for leave to file the successive petition should have been granted.

¶ 68                                     CONCLUSION

¶ 69 Defendant's motion for leave to file a successive petition and supporting documents satisfied the Act's cause-and-prejudice test. We thus reverse the circuit court's denial of his motion for leave to file a successive petition, and we remand for further proceedings on defendant's petition.

¶ 70 Reversed and remanded.

¶ 71 JUSTICE COGHLAN, dissenting:

¶ 72    The majority concludes that "defendant adequately alleged that counsel's investigation was unreasonable, insofar as counsel failed to investigate and identify Turner as a witness." In order to make a substantial showing of a constitutional violation, defendant must show that counsel's representation resulted in unfair prejudice. *People v. Johnson*, 2019 IL App (1st) 153204, ¶¶ 35, 42. "Prejudice is established 'by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process.'" *Id.* ¶ 35 (quoting 725 ILCS 5/122-1(f)). In *Johnson*, we considered whether the defendant established cause and prejudice in alleging that trial counsel was ineffective for failing to investigate and call an exculpatory witness whose "presence at the shooting was known." *Id.* ¶¶ 36-40. In this case, Turner was not a known witness and was not present at the time of the shooting.

¶ 73    In reaching the conclusion that defense counsel's investigation was "unreasonable," the majority speculates that counsel failed to realize that Knox, "as someone who was in the apartment on the date of the shooting," could have identified multiple witnesses present in the crack house at the time of the shooting, and those potential witnesses "could potentially have led to Turner." Although anything is possible, I disagree that counsel's failure to identify Turner as a potential witness was objectively unreasonable absent "a substantial showing that counsel was aware of potential witnesses *** who could have possibly provided exculpatory testimony, and [he] failed to investigate them." *Id.* ¶ 47.

¶ 74    Turner's affidavit established that he did not witness the shooting that resulted in the victim's death. From another room, he "heard four gunshots," saw Donna Knox's daughter holding "the same [gun] [the victim] was going to sell [him]" earlier in the day, "ran all the way home, and *** never went back to that crack house." In *Johnson*, 2019 IL App (1st) 153204, ¶ 45, defendant submitted an affidavit in support of his petition from a witness who "averred he was at the shooting

and defendant was not a shooter." In addition, "defendant's affidavit averred that he told trial counsel to send an investigator to the scene of the shooting to find witnesses but counsel did not do so. Defendant also averred that Williams was known to frequent the corner where the shooting took place and could have easily been found." *Id.* ¶ 47. Finally, "[t]rial counsel's affidavit averred that she did not recall sending an investigator to search the area of the shooting for witnesses and she did not send an investigator to search for Williams." *Id.* We found that "defendant made a substantial showing that counsel *was aware* of potential witnesses *** who could have possibly provided exculpatory testimony." (Emphasis added.) *Id.* In contrast, the defendant in this case does not even allege, much less make "a substantial showing that counsel was aware of potential witnesses *** who could have possibly provided exculpatory testimony." *Id.*

¶ 75    On facts similar to this case, we recently affirmed the denial of a request for leave to file a successive postconviction petition. See *People v. Horton*, 2021 IL App (1st) 180551, ¶ 1. In doing so, we recognized our supreme court's admonition that such requests are "reviewed under a higher standard than that applicable to the first stage for an initial petition." *Id.* ¶ 53 (citing *People v. Robinson*, 2020 IL 123849, ¶¶ 43, 58). Although *Horton* involved an actual innocence claim, in *People v. Bailey*, 2017 IL 121450, ¶ 21, our supreme court held that meeting the cause and prejudice test for a successive petition requires "the defendant to 'submit enough in the way of documentation to allow a circuit court to make that determination;' " further clarifying that " '[t]his is so under either exception, cause and prejudice or actual innocence.' " (quoting *People v. Smith*, 2014 IL 115946, ¶ 30). The new evidence at issue in *Horton*, like the instant case, consisted of an affidavit where the affiant put a gun in the victim's hand but did not witness the shooting in question. *Horton*, 2021 IL App (1st) 180551, ¶ 52; see *People v. Williams*, 2016 IL App (1st)

090884-C, ¶ 132 (noting that "the procedural hurdles to bringing an actual-innocence claim should be, at the very least, no higher than those for a cause-and-prejudice claim) (Emphasis omitted).

¶ 76     The *Horton* defendant's successive postconviction petition alleged that newly discovered evidence "supported his otherwise uncorroborated claim of self-defense." *Horton*, 2021 IL App (1st) 180551, ¶ 1. He attached an affidavit from Damien Hyde (an acquaintance of the victim), asserting that on the night of the shooting, the victim arranged to "meet him 'at the spot where [they] kept all the guns.'" *Id.* ¶ 32. The victim asked for a specific handgun, which Hyde gave to him. *Id.* Hyde left town for two days and when he returned, a witness to the shooting gave him back the gun and told him "'how they went to kill defendant, but defendant got the up's on [the victim]'" and killed him. *Id.* ¶ 33. The witness also told Hyde that he took the gun off of the victim. *Id.* This court denied defendant leave to file his successive petition, finding that Hyde "did not witness the shooting and does not allege that [the victim] ever displayed or threatened to use the gun." *Id.* ¶ 52. Since the affidavit and defendant's petition failed to show the essential elements of self-defense, we held that the defendant failed to establish "'the probability that it is more likely than not that no reasonable juror would have convicted the defendant in light of the new evidence.'" *Id.* (quoting *Robinson*, 2020 IL 123849, ¶ 50).

¶ 77     In *People v. Jackson*, 2021 IL App (1st) 190406-U, ¶ 31, (see Ill. S. C. R. 23(e)(1) (eff. Jan. 1, 2021) (nonprecedential appellate court orders entered on or after January 1, 2021, may be cited for persuasive purposes)), the defendant asserted self-defense at trial and was convicted of second degree murder, attempted first degree murder, and aggravated discharge of a firearm. Although *Jackson* also involved an actual innocence claim and not ineffective assistance of counsel, his postconviction petition was supported by an affidavit in which a witness recanted her testimony that none of the occupants of the vehicle at which defendant shot were armed, claiming instead

that the murder victim " 'had a gun' " in the vehicle and that after the group arrived at the hospital, another occupant of the vehicle " 'left with [the] gun to get rid of it.' " *Id.* ¶¶ 34-35. The circuit court summarily dismissed the petition. *Id.* ¶ 36. On appeal, this court rejected defendant's assertion that he established a claim of actual innocence, finding that the petition "set forth conclusory allegations that were insufficient to show that he acted in self-defense." *Id.* ¶ 45. The allegation that the murder victim " 'had a gun' " when the shooting occurred, with nothing more, failed to show that the "defendant was threatened with force or that he reasonably believed a danger existed." *Id.* ¶ 47.

¶ 78      In *People v. Smith*, 2021 IL App (1st) 181178-U, ¶¶ 2, 21, the defendant filed a postconviction petition alleging his trial counsel was ineffective for failing to investigate and call a particular witness to support his self-defense claim. In an attached affidavit, the witness asserted that she heard gunshots, ran in their direction, saw the victim on the ground with a gun in his hand, and saw another man take the gun and run away. *Id.* ¶ 21. We found that the witness's "testimony suggests that [the victim] may have had a gun on his person when defendant shot him, and explains why police did not find a gun near [the victim's] body" but it "does not establish defendant saw a gun or knew [the victim] was armed, and does not establish [the victim] threatened imminent force against defendant." *Id.* ¶ 32. We held that the defendant failed to establish an arguable claim of self-defense and therefore did not establish prejudice for the purpose of his ineffective assistance of counsel claim. *Id.* ¶¶ 30, 32.

¶ 79      Like the affidavits considered insufficient to support allowing a successive postconviction petition to be filed in *Horton*, *Jackson*, and *Smith*, Turner's affidavit in this case "does not establish defendant saw a gun or knew [the victim] was armed, and does not establish [the victim] threatened imminent force against defendant." See *id.* ¶ 32. Although Turner "heard" four gunshots, he was

not present when the shooting occurred. The fact that Turner saw Bowden with a gun earlier in the day does not, contrary to the majority's apparent assumption, establish that defendant was threatened with force or reasonably believed a danger existed. Turner "did not witness the shooting and does not allege that [the victim] ever displayed or threatened to use the gun." See *Horton*, 2021 IL App (1st) 180551, ¶ 52. Simply put, Turner has no idea what happened because he was not there, and his affidavit fails to allege or show that "but for counsel's unprofessional error[], the result of the proceeding would have been different." See *Strickland v. Washington*, 466 U.S. 668, 694 (1984); see also *Smith*, 2021 IL App (1st) 181178-U, ¶ 30, 32.

¶ 80    Accordingly, I respectfully dissent from the majority's holding that defendant has established the requisite prejudice required to file his successive postconviction petition.